**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **DILLARD A. PUTMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20CV00063 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **CORPORAL QUENTIN HARRIS, ET AL.**, | ) | JUDGE JAMES P. JONES |
| | ) | |
| | ) | |
| Defendants. | ) | |

*Jonathan E. Halperin, Andrew Lucchetti, and Darrell J. Getman, HALPERIN LAW CENTER, LLC, Glen Allen, Virginia, for Plaintiff; Julian F. Harf, GUYNN, WADDELL, CARROLL & LOCKABY, P.C., Salem, Virginia, for Defendants.*

The plaintiff, Dillard A. Putman, asserts claims under 42 U.S.C. § 1983 and state law against the defendants, Sergeant Travis Hayton and Corporal Quentin Harris, deputies with the Tazwell County Sheriff's Department. It is alleged that both defendants violated the plaintiff's Fourth Amendment rights by seizing him for a mental health evaluation without probable cause. It is further alleged that defendant Harris used excessive force in violation of the Fourth Amendment and state law when he directed a police dog to bite Putman, causing him severe injuries. Both sides have moved for summary judgment. The parties have also filed motions to exclude portions of proposed expert opinion trial testimony. For the reasons that follow, I will deny the plaintiff's Motion for Summary Judgment and grant in part and deny in part the defendants' Motion for Summary Judgment, and enter judgment

for defendant Hayton. I will grant in part and deny in part the plaintiff's Motions to Exclude Expert Testimony and deny the remaining defendant's Motion to Exclude Expert Testimony.

I.

The facts taken from the summary judgment record are largely uncontested. In the early evening on May 20, 2019, Kandi Mullins-Putman ("Kandi"), called 911 after she returned home from work to find her husband, Dillard A. Putman, missing from their home in North Tazewell, Virginia. Earlier that day, Putman had sent Kandi several text messages threatening self-harm. Specifically, he had told her that, "I'm going to make sure you never have to worry or be upset with me again," and "I'm going to end this." Pl.'s Mem. Supp. Mot. Summ. J. Ex. 5, Text Messages 1, 3, ECF No. 21-5. He further stated, "You are sooo fucking stupid I'm setting [sic] here with a gun in my mouth and you are clue-less. Fuck you you don't give a fuck. Don't come to the house I'd rather some-one else find me." *Id.* at 4–5. He concluded, "Good bye Kandi I love you." *Id.* at 6.

Kandi told the 911 dispatcher that she feared that her husband was going to kill himself. She stated that he had a gun in his mouth and that he was going to "end it all." *Id*. at Ex. 2, 911 Call at 0:30–0:56, ECF No. 21-2. The 911 dispatcher sent several deputies from the Tazewell County Sheriff's Department to the Putmans' home. Deputy Steven Bowles and Detective Robert Baldridge were the first to arrive

ten minutes later at approximately 6:00 p.m., where they found Kandi waiting outside in the driveway. She discussed her concerns about her husband with them, including that they were having marital problems and that Putman regularly drank alcohol. She also showed them the text messages that Putman had sent her. Kandi confirmed that Putman owned several firearms and while she had looked where he normally stored them in the house, she could not confirm if he had taken one with him. She explained that Putman often went for walks around the property, which was large and contained a wooded area. She then consented to allow the officers to search the house and the property for Putman.

The officers first searched the house. They were unable to locate Putman, but they did find a rifle in the attic of the house. They determined that they would use a K-9 officer to search for Putman in the wooded area behind the residence while it was still daylight. Around this time, additional law enforcement officers arrived, including Sergeant Travis Hayton and Corporal Quentin Harris. Harris, a K-9 officer, was accompanied by his police dog. Bowles briefed Hayton and Harris about the situation, including that Putman had threatened to commit suicide and "had a gun in his mouth." *Id*. at Ex. 8, Harris Dep. 15, ECF No. 21-8. Hayton and Harris then ventured into the woods on foot with the police dog to look for Putman. Hayton was wearing a body camera that recorded the entirety of the encounter with

Putman. A video of the encounter has been submitted to the court in connection with the pending motions.

After approximately four minutes, the dog caught a scent and guided Harris and Hayton directly to Putman. The officers found Putman lying on his back in a large, cratered-out hole at the base of an uprooted tree, with his hands crossed over his chest. The hole was approximately the length of Putman with room on either end, and wide enough to fit his body; it appeared to be about a foot or so deep. Harris, who got to Putman first, immediately tightened the leash on the dog to restrain him. Harris testified that when he approached the edge of the hole, Putman "had his eyes open and was . . . just looking at the canine." *Id.* at 18. Putman claims that he was asleep and woke up to the dog standing over him and Harris pointing his gun at him and yelling at him to stand up. Putman did not have a gun in his mouth, and he was lying calmly in the hole. The officers testified that they could not see any firearms in his possession or the surrounding area. They also said that they smelled alcohol and that there were empty beer cans near Putman, although they are not visible on the video. A few seconds later, Hayton, who was trailing behind Harris, approached with his gun drawn and immediately ordered Putman to get his hands up.

Putman initially refused the commands, asking, "Hands up for what, this is my property." *Id.* at Ex. 1, Body Cam Footage at 4:21, ECF No. 21-1. Hayton again

ordered Putman to get up. At this point, neither the officers nor Putman were speaking in raised voices, and Putman remained on his back in the uprooted-tree hole, with Harris and Hayton standing over him. Harris began to threaten Putman with the dog. He first told Putman, "You want to get dog bit?" *Id.* at 4:23. Seven seconds later, he threatened again, "Get up or the dog is going to bite you." *Id.* at 4:30–4:34. Putman stood up after a few seconds.

As soon as he stood up, Harris and Hayton started yelling at Putman to face away and turn around. Putman did not comply. Standing in the hole facing both officers, he asked, "Facing away for fucking what . . . Fuck you, I'm on my property, you're on my property, get that fucking dog off my property." *Id.* at 4:34–4:43. Harris warned Putman for the third time that "[t]he dog is going to bite you if you don't listen to us." *Id.* at 4:45. Hayton then lowered his rife and pulled out his taser. The dog started barking loudly at Putman as he kept demanding to know why the officers were on his property and asking what he did wrong. Putman repeatedly threatened to sue the officers and Tazwell County if the dog bit him. He also kept insisting on seeing a warrant.

The officers eventually informed him that they did not need a warrant. While pointing his finger at Harris, Putman replied, "The fuck you don't." *Id.* at 4:55. They then asked Putman if he was going to kill himself. Putman immediately replied that he wasn't. He then lifted up his shirt, twisted back and forth, asking, "Where's

the gun? Where's the gun? Show me the fucking gun." *Id.* at 5:22–5:27. The officers claim that when Putman lifted up his shirt, they could not see whether he had a gun in his back waistband. Harris Dep. 34, ECF No. 21-8; Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. Ex 1, Hayton Dep. 24–25, ECF No. 36-1.

With his hands outstretched to either side, Putman again refused to comply with the officers' commands to turn around, repeating his demands that the officers show him a warrant. Harris threatened Putman a fourth time with the dog, to which Putman angrily replied that he would sue if the dog bit him. Body Cam Footage at 6:01, ECF No. 21-1. The officers interrupted Putman and ordered him again to turn around. With his hands outstretched to either side, Putman demanded, "Or what?" *Id.* at 6:06.

At this point, after about two minutes of back-and-forth, Harris ordered the police dog to attack Putman. The dog initially missed, biting only Putman's clothing. Harris followed immediately behind the dog and pushed Putman to the ground. Hayton then moved over to secure Putman face-down on his stomach, while Harris went to control the dog, who was standing off to the side. Putman started muttering, "You're funny, punk," a few times, as he tried unsuccessfully to rise up onto his knees, despite Hayton holding him down. *Id.* at 6:13–6:18. Before he could get up, Hayton deployed his taser into Putman's back. Putman immediately started writhing on the ground, flipping onto his back. In the commotion, the dog re-

engaged and latched onto Putman's upper-right arm. Putman started screaming, "You got me! You got me!" *Id.* at 6:22. Hayton then rolled Putman back onto his stomach and handcuffed him. As Hayton switched Putman's position, the dog readjusted its bite but continued its hold. After Putman was secured in handcuffs, Hayton told Harris to order the dog to release his bite. Harris issued a command and the dog released. In total, the dog had latched onto Putman's arm for approximately 30 seconds.

Once secured in handcuffs, the officers escorted Putman back to the house without incident and took him into custody via a paperless Emergency Custody Order ("ECO"). Bowles searched his person and found only a pocketknife and small flashlight. No firearm was recovered. Emergency medical services responded to the scene and transported Putman to a local hospital for treatment of the bite wound. Given the severity of the damage to his right brachial artery, Putman was flown by helicopter to a larger hospital for emergency vascular surgery. The surgeon was required to harvest a vein from his leg to repair the artery.

On December 8, 2020, the plaintiff filed this lawsuit, asserting § 1983 claims against Hayton and Harris for seizing him without probable cause in violation of his Fourth Amendment rights (Count I). He also makes § 1983 and state-law assault and battery claims against Harris for excessive use of force by ordering the dog to bite him, in violation of his Fourth Amendment rights and Virginia law (Counts II,

III and IV). On January 26, 2022, the plaintiff moved for summary judgment of the federal claims. On February 3, 2022, the defendants moved for summary judgment on all claims, asserting they are entitled to qualified immunity on the federal claims and that Virginia's good faith immunity bars the state law claims. In addition, the parties have filed motions to exclude expert testimony. Specifically, the plaintiff moves to exclude improper medical testimony by proposed expert witness Harold D. Bennett and improper legal opinion testimony by proposed expert witness Robert D. Wershbale. The defendants move to exclude improper testimony by proposed expert witness Robert W. Metzger. The motions have been fully briefed and are ripe for decision.

II.

Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 (4th Cir. 2017).[1] "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v.*

[1] I have omitted internal quotation marks, citations, and alterations throughout this opinion unless otherwise noted.

*Judd*, 718 F.3d 308, 313 (4th Cir. 2013). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.*

Section 1983 provides a cause of action for plaintiffs who have suffered a deprivation of a constitutional or statutory right at the hands of a state or local official acting under color of state law. However, "[q]ualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The qualified-immunity analysis involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The court "may address these two questions in the order that will best facilitate the fair and efficient disposition of each case." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015). The first step is fact-intensive and can be determined by the judge on summary judgment or by the jury if the matter goes to trial, whereas the second step is a question of law for the court to decide. *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019). The plaintiff survives summary judgment only if the court answers both questions in the affirmative. *Estate of Armstrong ex rel. Lopez v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016).

A. Unlawful Seizure (Count I).

My initial inquiry is whether the facts, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. In the mental health context, the court considers "whether the officials had probable cause to seize the person for an emergency mental evaluation." *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020). "Such probable cause exists when the facts and circumstances within the defendant's knowledge and of which the defendant had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." *Id.* Probable cause is undoubtedly a "fluid concept that cannot be reduced to a neat set of legal rules." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). "This is particularly true in the mental health context," *Barrett*, 975 F.3d at 429, where "officers with little or no training in mental health issues" are required to make "difficult judgment calls," *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 170 (4th Cir. 2016).

There are several Fourth Circuit decisions relevant to whether the defendants violated a constitutional right in this case. First, in *Bailey v. Kennedy*, the court determined that probable cause was lacking where the officers detained the plaintiff for an emergency medical evaluation based solely on a neighbor's 911 call. 349

F.3d at 740. The neighbor had observed the plaintiff riding his bike while intoxicated and falling over. *Id.* at 734. She told the 911 dispatcher that he was "going home to commit suicide" and that he "had been depressed." *Id.* When the officers responded to the scene, however, they found the plaintiff eating lunch in his dining room, where he denied that he was suicidal and was "not visibly distraught or crying." *Id.* at 740. Moreover, there were "no weapons or other suicide preparations evident." *Id.* Based on these facts, the court reasoned that "[w]ithout more, the 911 report cannot bear the weight" of establishing probable cause, concluding that the "[l]aw does not permit random or baseless detention of citizens for psychological evaluations." *Id.*

Similarly, in *Goines v. Valley Community Services Board*, it was "sufficiently beyond the realm of probable cause" for the officers to detain "a man with physical disabilities who exhibited no signs of mental illness and made no threats of harm." 822 F.3d at 170. Although the plaintiff exhibited some "speech and other physical difficulties," the court reasoned that the officers improperly "assumed a threat without exploring whether the situation reflected some misunderstanding, a bizarre but non-dangerous incident, or something more problematic." *Id.*

In contrast, in *S.P. v. City of Takoma Park*, the police had probable cause to detain the plaintiff for a mental health evaluation where her husband had reported that she was suicidal, and when they arrived on scene, they found her "obviously

distraught and crying." 134 F.3d 260, 267 (4th Cir. 1998). The officers had an opportunity to observe and interview the plaintiff, and "[a]lthough she denied having any suicidal thoughts . . . she was uncooperative, hostile, very upset, and irrational." *Id.* The court concluded that involuntary detainment "was not only reasonable, but prudent." *Id.* Likewise, in *Cloaninger ex rel. Cloaninger v. McDevitt*, 555 F.3d 324, 332 (4th Cir. 2009), the officers had probable cause to detain the plaintiff after he called the hospital, seeking assistance after taking a prescription drug that made him feel "flighty." The doctor then called 911 and requested police assistance for a suicide threat. *Id.* The officers were also aware that the plaintiff had made prior suicide threats and that firearms had previously been found in the house. Although it was disputed whether the plaintiff was also acting belligerent, the court nevertheless determined the facts were enough for an objectively reasonable officer to conclude that the plaintiff was a danger to himself. *Id.* at 333–34.

Here, the plaintiff argues, relying principally on *Bailey*, that defendants lacked probable cause because they relied solely upon the 911 call. Although the 911 call came from Putman's spouse, not a neighbor, Putman maintains that the identity of the caller is insignificant. He claims that the defendants may have been justified in relying on the 911 call initially, but they detained him without "information actually suggesting that [his] mental status at the time presented an imminent danger" of harm to himself or others and without "tak[ing] the time to conduct any meaningful

investigation, or deliberate." Pl.'s Mem. Supp. Mot. Summ. J. 12, ECF No. 21. In other words, the plaintiff contends that the defendants were required to assess whether the 911 call was sufficiently corroborated by the individual to be seized. He therefore asserts that the defendants' lawful basis to detain him "evaporate[d] the moment" that they "did not see him with a gun in his mouth, or any gun at all." *Id.* at 13.

I disagree. Unlike in *Bailey*, the defendants relied upon more than just a 911 call. They relied on credible, relevant information not only from Putman's spouse, but also from Putman himself. Kandi called 911 seeking help after she received several disturbing text messages from Putman, including that he had a gun in his mouth and was "going to end this." Text Messages 3, ECF No. 21-5. The neighbor in *Bailey* was merely speculating about the plaintiff's suicidal intent, but Kandi was relying on Putman's own words. The defendants were also fully briefed on the situation, including that Putman had threatened suicide with a firearm. They knew that Putman owned several firearms, and that the officers had already found at least one firearm while searching his home. Given that much of the information that Putman's spouse provided was corroborated, the defendants had no reason to doubt her reliability and trustworthiness.

Furthermore, after the defendants located Putman, they did have an opportunity to observe his conduct and demeanor.[2] Unlike in *Bailey* and *Goines*, Putman was not calmly "sitting at the dining room table eating lunch" when the officers arrived, nor was he exhibiting "no signs of mental illness." *Bailey*, 349 F.3d at 739; *Goines*, 822 F.3d at 170. Putman instead may have been intoxicated and was acting strangely. The defendants found him lying in what looked like a shallow grave after he had threatened to commit suicide mere hours beforehand — an undeniably odd situation. It is true that he did not make threats of self-harm in front of the officers, but his behavior nonetheless reflected some indicia that he was suffering from mental health issues. For instance, as in *City of Takoma Park*, Putman was being combative, uncooperative, and evasive. 134 F.3d at 267. Putman may have denied that he was going to kill himself when asked, but the defendants knew that he had threatened suicide earlier in the day. Even if Putman's threats to his wife were not serious, the defendants were not required "to walk away from the situation"

[2] Putman argues that he may have been seized at the moment that the defendants approached him with their weapons pointed at him. Pl.'s Mem. Supp. Mot. Summ. J. 12, ECF No. 21. At that point, the defendants had not observed Putman, or had a chance to investigate his mental state. This argument fails because "[w]here as here, physical force is absent, a seizure requires both a show of authority from law enforcement officers and submission to the assertion of authority by the [individual]." *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015). Although the defendants made a show of authority by pointing their weapons at Putman, the plaintiff did not submit to that authority. Rather, his conduct is best described as "passive acquiescence." *Id.* at 998. Put differently, there was at most an attempted seizure, which is not protected by the Fourth Amendment.

based on his denial. *Barrett*, 975 F.3d at 431. If they had done nothing, and Putman had hurt himself, the "consequences may have been irremediable." *Id.*

In sum, I find that the facts in this case establish that the officers' conduct was objectively reasonable — that is, that they had probable cause to seize Putman for a mental health evaluation. Because no constitutional violation occurred, I need not consider whether the right was clearly established. *Armstrong ex rel. Lopez*, 810 F.3d at 898. Accordingly, I will grant the defendants' Motion for Summary Judgment as to Count I. Because defendant Hayton is only sued in Count I, judgment in his favor will be entered and he will be removed from the case.

B. Excessive Use of Force (Count II).

i. Constitutional Violation.

Turning to Count II, I first consider whether Harris' conduct violated a constitutional right, viewing the facts in the light most favorable to Putman. The Fourth Amendment's prohibition on unreasonable seizures bars police officers from "using excessive force to seize a free citizen." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003). Whether an officer used excessive force is based on an "objective reasonableness" standard. *Id.* The court's focus is "on the moment that force was employed," *Thomas v. Holly*, 533 F. App'x 208, 219 (4th Cir. 2013) (unpublished), and I must "consider the facts from the perspective of a reasonable officer on the scene," without "judging the officer's conduct with the '20/20 vision

of hindsight.'" *Jones,* 325 F.3d. at 527 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). Disregarding the officer's intent or motive, the court "ask[s] whether a reasonable officer in the same circumstances would have concluded that at threat existed justifying the particular use of force." *Hupp*, 931 F.3d at 321–22. Those circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "extent of the plaintiff's injury is also a relevant consideration." *Jones*, 325 F.3d at 527.

Here, the first *Graham* factor favors the plaintiff. The officers have never argued that Putman committed a crime, or that they had probable cause to make a criminal arrest. When the plaintiff has "not committed any crime, this factor weighs heavily in [the plaintiff's] favor." *Bailey*, 349 F.3d at 743–44. Moreover, "where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure." *Armstrong ex rel. Lopez*, 810 F.3d at 901. The use of force to harm the individual is rather "manifestly *contrary* to the government's interest in initiating that seizure." *Id.*

The officers argue, however, that the Fourth Circuit has recognized that this factor may be considered as a proxy for determining the potential dangerousness of the individual. *Id.* at 900. They emphasize that they had reliable information — and

therefore were on notice — that Putman was potentially armed. They maintain that Putman posed a danger not only to himself but also to others. Nevertheless, the facts viewed in the light most favorable to the plaintiff show that he only ever threatened to harm himself. The first *Graham* factor weighs against the imposition of force.

The second and third *Graham* factors, whether Putman threatened the safety of others and resisted seizure, appear to justify some use of force. The officers believed that he could be armed, based on information from his spouse. Although the officers did not see any firearms on Putman's person or in the vicinity, they were concerned he had one tucked into his back waistband. They contend that they were unable to eliminate this possibility after Putman lifted his shirt several times, twisting side-to-side and asking where the gun was located. They also assert that Putman's mentioning of the gun raised their suspicions. He refused to comply with the officers' commands to turn around or face away. The officers further emphasize that Putman continued to resist after he was initially restrained. Specifically, he tried to get up onto his knees after Harris tackled him to the ground. Only after Hayton deployed the taser and the dog re-engaged, latching onto his upper-right arm, did Putman permit the officers to place him in handcuffs, screaming that they "got" him. Body Cam Footage at 6:22, ECF No. 21-1.

On the other hand, Putman did not make any threatening movements or statements towards the officers. At most, he angrily pointed his finger and

threatened to sue them and Tazewell County. The mere use of profane language, even yelling, does not establish an immediate threat. After observing Putman for over a minute, Hayton lowered his gun and took out his taser, potentially indicating a reduced threat level. The officers suggest that Putman mentioning of the gun was alarming. But a reasonable inference from his statement is that Putman knew what he had texted his wife, and when the officers asked if he was going to commit suicide, he assumed that they were asking about the gun.

Harris also ordered the dog to bite Putman after a mere two minutes of verbal instruction, without any particular action by Putman shifting the dynamics or escalating the situation into an immediate threat. There is no question that Putman was refusing to comply with the officers' commands to turn around. However, the mere refusal to cooperate, without more, is not a direct act of resistance. *Graham v. Gagnon*, 831 F.3d 176, 187 (4th Cir. 2016). Even if an individual is resisting seizure, and some use of force is justified, the degree must be reasonably calculated either to prevent flight or similarly stymie the level-of-resistance from escalating. *Armstrong ex rel. Lopez*, 810 F.3d at 901. Putman was not attempting to flee or physically resisting when Harris released the dog. Rather, he was standing with his hands outstretched, repeating his demands to see a warrant, as he had done for the past minute. Putman's "refus[al] to comply with shouted orders" to turn around, "while

cause for some concern, do not import much danger or urgency into a situation that was, in effect, a static impasse." *Id.* at 901–02.

Finally, it is undisputed that Putman sustained a serious injury. The dog severed an artery in his right arm. He was transported for emergency surgery shortly after the incident, where his doctor was required to harvest a vein from his leg to repair the artery.

Based on these facts, I find that the plaintiff has proffered sufficient evidence that defendant Harris used excessive force in order to survive summary judgment. While Putman asserts that Harris' conduct constituted a constitutional violation as a matter of law, it is necessary to "assess the objective reasonableness of force . . . in full context, with an eye towards the proportionality of the force in light of all the circumstances." *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). The court should grant summary judgment only if no reasonable jury could find for the non-movant. The video is not conclusive as to whether Harris reasonably could have believed that Putman may have possessed a gun. There is thus evidence that might convince a jury that the totality of the circumstances supported Harris' conduct, namely whether the officers were in immediate danger, as they claim, and if the particular use of force was justified. I find it appropriate that a well-instructed jury determine the excessive force claim.

*ii. Qualified Immunity.*

Even if a constitutional violation occurred, defendant Harris would be entitled to qualified immunity unless the right violated was clearly established at the time of the violation. "[T]he proper focus [of this inquiry] is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994). Nevertheless, the Supreme Court and Fourth Circuit have clarified that the violated right need not have "been recognized by a court in a specific context before such right may be held clearly established for purposes of qualified immunity." *Meyers v. Baltimore Cnty.*, 713 F.3d 723, 734 (4th Cir. 2013). It is sufficient that pre-existing law gave the officer "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Fourth Circuit has repeatedly recognized that it is a violation of clearly established law in this circuit to employ excessive force "in the course of making an arrest or otherwise seizing a person." *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019). This rule extends to seizures or attacks by police dogs that were improperly deployed by their handlers. *Vathekan v. Prince George's Cnty.*, 154 F.3d 173, 179 (4th Cir. 1998).

In *Kopf v. Wing*, several officers responded to reports of armed robbery and cornered two suspects "behind a shed in the back yard of a house," hiding in "an

extremely narrow passage" with no escape. 942 F.2d 265, 266 (4th Cir. 1991). The officers deployed a police dog to apprehend the suspects. It was disputed whether the officers ever announced the dog was being released, but regardless, the dog left one of the suspects "frightfully mauled." *Id.* at 267. The Fourth Circuit held that a reasonable jury could "find the *degree* of force excessive" where the suspects were surrounded and the officers did not reasonably fear a weapon, as they had holstered their guns and placed themselves in close proximity to the suspects. *Id.* at 269.

Similarly, in *Vathekan*, the Fourth Circuit reversed a grant of summary judgement based on qualified immunity. In that case, the dog alerted to the presence of a person within a home that was the target of a suspected burglary. 154 F.3d at 176. Without announcing, the officer released the dog into the home, resulting in serious injuries to the homeowner. *Id.* at 176–77. The court reasoned that at the time of the attack, four years after *Kopf v. Wing* was decided, it was "clearly established . . . that failing to give a verbal warning is required before deploying a police dog to seize someone is objectively unreasonable." *Id.* at 179.

Defendant Harris contends that these decisions stand for the proposition that a Fourth Amendment violation occurs only when an officer is not facing an immediate threat and fails to give a warning. The defendant asks this court to consider two other relevant Fourth Circuit decisions. In *Meyers*, the court held that the officers' use of seven additional taser shocks was unreasonable after the subject

was no longer armed, had been brought to the ground, was physically restrained by several officers, and was no longer resisting arrest. 713 F.3d at 734–35. In *Armstrong ex rel. Lopez*, the court held that it was objectively unreasonable for police officers to tase a mentally ill man who had not complied after a mere 30 seconds with their directions to unwrap himself from a stop sign. 810 F.3d at 906. The defendant argues that his case falls somewhere in the middle, emphasizing that Putman was intoxicated and noncompliant, potentially suicidal, and potentially armed. They also warned Putman on several occasions that if he did not comply, he was going to get "dog bit." Body Cam Footage at 4:23, 4:45, ECF No. 21-1.

But the Fourth Circuit has held that the use of serious or violent force in arresting or otherwise seizing an individual who is not actively resisting and does not pose an immediate threat amounts to a constitutional violation. *Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016). In that case, the court held that "it was clearly established . . . that a police officer was not entitled to use unnecessary, gratuitous, or disproportionate force" following a traffic stop against a nonviolent suspect who, while not restrained, "presented no threat to the safety of the officer or the public and who was compliant and not actively resisting arrest or fleeing." *Id.* The court explained that the officer had "fair notice" that the force he used was unconstitutionally excessive, even though prior precedents addressed the use of force against secured suspects. *Id.* In *Smith v. Ray*, the court rejected the officers'

attempts to draw subtle factual distinctions with prior excessive force cases, reasoning qualified immunity may be denied even if those cases were not "factually on all fours." 781 F.3d 95, 104 (4th Cir. 2015). Rather, the officer was not entitled to qualified immunity based on "the simple fact that the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tact that quickly escalated to a violent exchange." *Id.*

Although there is no Fourth Circuit case that is on all fours with the facts presented here, its prior decisions nonetheless would give fair warning that ordering a police dog to bite a person who, while using profane language, was not attempting to flee or physically resisting seizure, and who had not complied with commands after only two minutes was objectively unreasonable.

The Fourth Circuit has drawn a critical distinguishing line between "immediate danger" and "imminent danger." *Armstrong ex rel. Lopez*, 810 F.3d at 903; *Meyers*, 713 F.3d at 734. In explaining the "risk of immediate danger," the court stated that "[a]t bottom, 'physical resistance' is not synonymous with 'risk of immediate danger,'" and "the subject of a seizure does not create such a risk [of immediate harm] simply because he is doing something that can be characterized as resistance." *Armstrong ex rel. Lopez*, 810 F.3d at 905, 909. The court concluded that the officers' use of a taser was disproportionate "in the face of stationary and non-violent resistance to being handcuffed." *Id.* at 910.

It therefore was clearly established at the time of violation that the use of a canine — a level of force that risks serious injury — on an individual with mental health issues without evidence that he was actively resisting is an unconstitutional use of force. I find that because the facts are in dispute as to whether Harris had a reasonable belief that Putman may have been armed, the defense of qualified immunity cannot be resolved and I will deny his motion for summary judgment.

C. State Law Assault and Battery (Counts III & IV).

Putman also asserts state-law assault and battery claims against Harris. Under Virginia law, police officers are legally justified in using reasonable force to execute their lawful duties. *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009); *Pike v. Eubank,* 90 S.E.2d 821 (1956). "Accordingly, if reasonable force is used by police officers in execution of their lawful duties, they are immune from suit for such acts." *Ware v. James City Cnty.*, 652 F. Supp. 2d 693, 712 (E.D. Va. 2009). Virginia state-law assault and battery claims are analyzed under Fourth Amendment principles. *Carter v. Khan*, No. 1:15-CV-00572 (JCC/JFA), 2015 WL 6738607, at *13 (E.D. Va. Nov. 4, 2015). "If the alleged police actions were constitutional or if the officers were entitled to a qualified immunity defense, then these [state law] claims would also be dismissed." *Crihfield v. City of Danville Police Dept.*, Nos. 4:07CV00010, 4:07CV00011, 2007 WL 3003279, at *3 (W.D. Va., Oct. 11, 2007). Because Harris

is not entitled to qualified immunity on the § 1983 claim, I will deny his Motion for Summary Judgment on the state-law claims.

III.

Because I find that the issues as to Count II and the state law claims must be presented to a jury, I will deny the plaintiff's Motion for Summary Judgment as to these claims.

IV.

The parties have also filed motions to exclude certain opinions of experts; two motions raised by the plaintiff against the officer's experts, and one motion by the remaining defendant against the plaintiff's expert. I will address each in turn.

A. Expert Opinions of Harold D. Bennett.

The plaintiff challenges the admissibility of certain opinions offered by Harold D. Bennett. Bennett is a retired Norfolk, Virginia, police officer with nearly 50 years of experience handling and training police K-9 units. He attests that he has "investigated, witnessed and observed hundreds of dog bites in [his] forty-seven years of working with canines." Pl.'s Mem. Supp. Mot. to Exclude Ex. A, Bennett Report 1, ECF No. 17-1. The plaintiff concedes that Bennett may properly testify about the appropriate use of force, including police dogs. However, in his report, Bennett stated that he reviewed pictures of Putman's dog bite injury and concluded that there was "no evidence of any thrashing by the K-9," and that "in [his]

experience if thrashing occurred[,] tears in the arm would be present." *Id.* The plaintiff moves to exclude this opinion.

The plaintiff contends that this is medical opinion testimony beyond the scope of his expertise, and that there is not a reliable scientific basis for the testimony, as Bennett never evaluated Putman or consulted his medical records. Rather, Bennett relied on photographs of the bite marks as the basis for his opinions. In response, the defendant argues that Bennett is qualified based on his experiential expertise. They dispute the plaintiff's characterization of Bennett's opinion, which does not opine on "the extent of Putman's injuries or medical needs," but rather, are focused on interpreting the "dog bite wound and what it means *about the dog's behavior*." Defs.' Mem. Opp'n 6–7, ECF No. 33.

Under Rule 702, "trial judges act as gatekeepers to 'ensure that any and all scientific testimony is not only relevant, but reliable.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)). An expert may be qualified based on "knowledge, skill, experience, training or education." Fed. R. Evid. 702. The inquiry is dependent upon the field of expertise, and in certain contexts, experiential opinion testimony, which does not rely on any particular scientific method, is admissible. *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007).

I find that Bennett may testify based on his experience in recognizing certain types of bite wounds from police dogs and that he may provide his opinions about what those marks say about the dog's behavior, i.e., whether "thrashing" occurred. I disagree with the plaintiff's characterization of Bennett's testimony. It is evident from his report that he is not testifying about the extent of Putman's injuries caused by the dog bite. I agree that such testimony would only be appropriate for a medical professional. Bennett proposes to testify based on his familiarity with observing countless dog bite wounds over the course of his long career as a law enforcement officer, including where thrashing was present. The plaintiff's concern about Bennett relying upon photographs of the bite wound is also not enough to keep his opinions from the jury. Such concerns go to the expert's credibility and the weight of his testimony, not reliability. For these reasons, I will deny the plaintiff's motion.

B. Expert Opinions of Robert D. Wershbale.

The plaintiff challenges the admissibility of opinions offered by Robert D. Wershbale. Wershbale was designated by the defendants as an expert in law enforcement procedures and policies. He has served as a law enforcement officer since 1995 and is certified as a police instructor. The plaintiff does not dispute that Wershbale is qualified to provide opinions on police practices or procedures, including when the use of force is appropriate. However, the plaintiff argues that

his written report includes legal standards and opinions that usurp the role of the court and the jury.

Specifically, the plaintiff objects to seven opinions in the report: (1) the definition of "mental illness" under Virginia law; (2) the legal standard for "probable cause"; (3) the legal conclusion that a "reasonable person" would have found Putman needed a mental health evaluation; (4) the conclusion that Harris and Hayton used force "*lawfully*" to detain the plaintiff; (5) the legal conclusion that Harris and Hayton attempted to "*lawfully* locate and detain" the plaintiff to execute an ECO evaluation; (6) the definitions of excessive force under federal and Virginia law; and (7) the conclusion that the "deputies' purpose for using force was to *lawfully* detain" the plaintiff. Pl.'s Mem. Supp. Mot. to Exclude 2–3, ECF No. 19.

In response, the defendant concedes that Wershbale's use of the term "lawfully" is an impermissible legal opinion, and he has agreed that the expert will not so testify as set forth in Opinions 4, 5, and 7. As to Opinions 1, 2, and 6, the defendant argues that Wershbale provides the definitions to explain how the defendant was trained. Specifically, it will help the jury determine what a "reasonable officer" would have done under the circumstances in light of his experience and training, i.e., whether they could detain Putman and what force was permissible. As to Opinion 3, the defendant explains that there was a typo in the report. Wershbale will testify as to what a "reasonable *officer*" would have

concluded, not a "reasonable person." They contend that this is specialized knowledge that is permissible under Rule 702.

It is well-established that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 561–62 (4th Cir. 2006); *see also United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) ("testimony that does little more than tell the jury what result to reach . . . is properly excluded). However, "Rule 704(a) allows an expert to offer an opinion about an ultimate issue to be decided by a jury." *United States v. Dalton*, No. 1-17CR00024, 2018 WL 356205, at *5 (W.D. Va. Jan. 10, 2018). The Fourth Circuit has held that an expert may refer to an officer's training, including the use of police dogs, to provide an opinion on the objective reasonableness of that officer's actions. *Kopf v. Skyrm*, 993 F.2d 374, 379 (4th Cir. 1993); *United States v. Mohr*, 318 F.3d 613, 624 (4th Cir. 2003). "Testimony about intent or motive lies outside the bounds of expert testimony." *Newkirk v. Enzor*, Nos. 2:13-1634-RMG, 2:13-1635-RMG, 2017 WL 823553, at *4 (D.S.C. Mar. 2, 2017).

As to Opinions 4, 5, and 7, Wershbale's use of the term "lawfully" is an impermissible legal opinion and must be excluded. The defendant's removal of the term resolves most of the objections to these opinions. However, Opinion 7 is still impermissible as it provides a conclusion on why the defendant used force, albeit one that is fairly obvious to a layperson, and an expert may not testify about intent.

As to Opinions 1, 2, and 6, it is impermissible for an expert witness to provide a legal standard. I recognize the defendant's argument that these definitions are being provided for a different purpose, but the jury may be confused by this subtle distinction. In any event, Opinions 1 and 2 are no longer relevant since the remaining defendant is entitled to qualified immunity on the unlawful seizure claim.

As to Opinion 6, while an expert may testify about police training, including the appropriate level of force, Wershbale does not need to provide the definition for excessive force to testify on whether the defendant's actions were reasonable. The court will instruct the jury on the standard for the excessive use of force, and it is for the jury to decide whether the defendant's actions meet that standard.

Finally, as to Opinion 3, Wershbale may give an opinion as to whether a reasonable officer would have concluded, based on the totality of the circumstances here, that the use of a police dog was appropriate. Such testimony will be helpful to the trier of fact in determining a key issue in this case and is consistent with Fourth Circuit caselaw. *See, e.g.*, *Kopf v. Skyrm*, 933 F.2d at 379.

In sum, I will grant the plaintiff's motion as to Opinions 1, 2, 6, and 7, and deny the motion as to Opinions 3, 4, and 5.

C. Expert Opinions of Robert W. Metzger.

The remaining defendant challenges the admissibility of certain opinions offered by the plaintiff's expert, Robert W. Metzger. Specifically, the defendant

claims that Metzger is not qualified to give opinion testimony regarding police dog handler practices. Second, they argue that his opinion that different verbal tactics might have changed the outcome is too speculative. Metzger is a retired police chief with over 44 years of experience in law enforcement. Most recently, he served as a police chief from 2011–2019, where he oversaw 78 officers and a K-9 unit with four police dogs. He has trained officers with respect to the use of dogs, including how to first exhaust other, non-lethal force, and conducted use-of-force reviews. He also has expertise as a former SWAT negotiator, particularly with responding to scenes where a person has threatened suicide with a gun or was intoxicated.

As to the first issue, the defendant argues that because Metzger is not trained as a K-9 handler, he may not testify on K-9 handler practices or the use of a dog as a use of force tool. Rather, he may testify only about use of force tactics generally. The defendant takes particular issue with Metzger's opinion that he "would have expected the handler to quiet the dog" in order to de-escalate the situation. Defs.' Mem. Supp. Mot. to Exclude Ex. 1, Metzger Report 5, ECF No. 25-1. As to the second issue, the defendant argues that Metzger should not be permitted to testify that if the deputies had "spent some time talking to Putman and trying to address his questions and their reasons for being at his location, it could have changed the outcome." *Id.* at 4. He claims this opinion is "unsupported speculation" and should be for the jury to decide. *Daubert*, 509 U.S. at 590.

The Fourth Circuit has held that persons with extensive law enforcement experience, including former police chiefs, are qualified to testify about the training and use of police dogs. *Kopf v. Skyrm*, 993 F.2d at 378–79; *Mohr* 318 F.3d at 623. The reality is that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Here, I find that Metzger's many years of experience, particularly his experience overseeing K-9 units, qualify him to opine on the use of dogs as a force tactic. There is no reason to narrowly circumscribe the category of expertise to only K-9 handlers, even though that may be an issue on cross-examination.

Applying these same principles, I find that Metzger may also provide his opinion on whether different de-escalation tactics could have led to different outcomes. I do not find such opinion to be speculative, but rather is likely grounded in Metzger's extensive experience in de-escalating volatile situations, particularly where an individual appears intoxicated and has threatened self-harm. The jury may determine how much weight to give such opinion testimony, and of course, the defendant may explore any weaknesses of Metzger's opinion on cross-examination. I will therefore deny the defendant's motion.

IV.

For the reasons stated, it is **ORDERED** as follows:

1. The plaintiff's Motion for Summary Judgment, ECF No. 20, is DENIED;

2. The defendants' Motion for Summary Judgment, ECF No. 22, is GRANTED as to Count I, and denied as to Counts II, III, and IV;

3. Judgment is entered in favor of defendant Travis Hayton and the Clerk is directed to terminate him as a party;

4. The plaintiff's Motion to Exclude Improper Medical Opinions of Harrold D. Bennett, ECF No. 16, is DENIED;

5. The plaintiff's Motion to Exclude Improper Legal Opinions of Robert D. Wershbale, ECF No. 18, is GRANTED IN PART AND DENIED IN PART; and

6. The defendant's Motion to Exclude Expert Testimony of Robert W. Metzger, ECF No. 24, is DENIED.

ENTER: March 28, 2022

/s/ JAMES P. JONES
Senior United States District Judge